Filed 3/23/22  P. v. Mack CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MELVIN LEWIS MACK, JR.,<br><br>     Defendant and Appellant. | A160385<br><br>(Humboldt County<br>Super. Ct. No. CR1904241B) |

A jury convicted Melvin Lewis Mack, Jr. of three felonies, including robbery.  The trial court sentenced him to prison and imposed a restitution fine and two assessments.  On appeal, Mack argues the robbery conviction must be reversed because the prosecution "violated the rules of discovery" by disclosing evidence on the eve of trial.  He also challenges his sentence.  We vacate the sentence and remand for resentencing.

### BACKGROUND

The prosecution charged Mack and two codefendants — John James Forrester and Pedro Sanchez, Jr. — with armed robbery (Pen. Code, §§ 211, 12022, subd. (a)(1), count 1; undesignated statutory references are to this code); possession of a firearm by a felon (§ 29800, subd. (a)(1), count 3); and unlawful possession of ammunition (§ 30305, subd. (a)(1), count 4).  At trial, the parties presented the following evidence:

1

In September 2019, Seth R. owned property on Salmon Creek Road (the road) in Humboldt County, near U.S. Highway 101.  On the property were two houses and a greenhouse.  Seth's adult children, including his daughter, Taylor R., lived in one house; his aunt, Annette M., lived in the other.  The greenhouse contained approximately 100 mature marijuana plants.  At 5:30 a.m. on September 1, Seth's friend told him there was a black car, and two men, near the property.  Seth drove to the property to check on his family. He looked around — including inside the greenhouse — but nothing seemed amiss.  So he decided to return home.  Before he left, Seth told Taylor to be on the lookout for people "lurking around."

About 45 minutes later, a motion sensor alerted Taylor to activity in front of the greenhouse.  Taylor went to the greenhouse to investigate.  As she approached the greenhouse, Taylor saw the leaves of the marijuana plants "shaking."  Moments later, two men — later identified as Sanchez and Forrester — exited the greenhouse carrying bags.  Taylor shouted at them. Sanchez "took off running" toward the highway; Forrester took a step, fired a handgun with a "silver barrel," and fled.  As he ran, Forrester fired a second shot in Taylor's direction.  Several more shots were fired as Taylor raced to the safety of her house.

At 7:00 a.m., Annette heard gunshots and screaming, and she saw two men "running through the gulch."  She walked toward the road; there she saw a black BMW sedan with pink rims and a Pink Panther decal on the hood.  A man — later identified as Mack — was in the driver's seat.  Annette asked Mack whether "he knew who was shooting and what was going on." Mack replied, " 'I don't know.' "  Not long after, Mack drove away.  A neighbor also heard gunshots and saw two men running toward the highway.  The neighbor walked toward the road, where he saw a "Pink Panther vehicle"

driving slowly back and forth as though the driver was "looking for somebody." The neighbor approached the car and asked the driver, Mack, whether he was looking for someone. Mack said he was looking for "two people." Then "he drove off."

Meanwhile, Taylor reached her house. She called her father, screaming and begging for help from the people who were robbing and " 'shooting at her.' " Seth jumped in his car and drove to the property. He did not see anyone, but he noticed the branches of the marijuana plants in the greenhouse were broken and there were "leaves all over the place." Seth decided to drive along the road, to see if anyone was hiding on the property. Annette accompanied him.

At the northern edge of the property, Seth and Annette saw the BMW. They stopped beside it and spoke to Mack, who was in the driver's seat. Mack said he saw a "guy" wearing a hooded sweatshirt run across the road; Mack also mentioned a "black truck" near a weighing station on the highway. Seth and Annette drove to that location but did not see a black truck, so they continued driving. About 30 minutes later, they spotted the BMW parked along a riverbank close to an access road near Seth's property. As Seth and Annette pulled up behind the car, it promptly drove away.

Later that morning, Annette, Seth, and Seth's neighbor saw the BMW parked on the road about a mile north of Seth's property. Mack was still in the driver's seat. But this time, Forrester was in the passenger seat. He looked as though "he had been in the bushes" — he was covered in leaves and briars, and his fingers were coated with marijuana resin. Seth demanded to know where Forrester had "come from." In response, Forrester mumbled that " 'he had taken off when the shooting started.' " When Seth asked why the two men were in the area, Mack said they were trying to buy marijuana from

3

a person named "A.J." At that point, another neighbor's car arrived. Nervous, Mack asked, " 'What's going on here?' " Then he drove away. At that point, Seth called 911. The operator told Seth that another caller reported a person "jumping out of the bushes and . . . into that vehicle."

At approximately 9:30 a.m., a California Highway Patrol officer received a report from dispatch to be "on the lookout for a black BMW" with large pink wheels and a "Pink Panther" image on the hood. About 30 minutes later, the officer saw the car at a gas station. Forrester was in the passenger seat; a loaded shotgun was wedged between the driver and passenger seats. Officers detained Forrester and searched him. They found a shotgun shell in his pocket and a cell phone on the ground near the passenger side of the car. Forrester admitted he had done " 'a stupid thing' " but maintained he did not " 'point the gun at [Taylor], he pointed it away from her.' "

A few minutes later, Mack emerged from the gas station bathroom carrying a cell phone. Law enforcement officers detained him. An officer searched Mack and found a .223-caliber rifle bullet in his pants pocket. Officers also searched the car. In the trunk, they found a cache of weapons and ammunition, including a handgun with a "silver slide," an "upper receiver" of an AR-15 rifle, several loaded rifle magazines, shotgun shells, and .9- and .40-millimeter handgun ammunition. Officers also found several cellphones, information showing Mack was the registered owner of the car, and marijuana trimming scissors and garden shears.[1]

---

[1] Law enforcement officers found Sanchez — along with one pound of freshly-harvested marijuana — at a nearby campground. On Seth's property, officers found a .9-millimeter bullet casing near the greenhouse; in a culvert near Seth's property, officers located .40-millimeter bullet casings. The parties stipulated Mack had a prior felony conviction.

After being advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, Mack told a law enforcement officer the guns were registered to Forrester, his half brother.  An evidence technician extracted data from Mack's cell phone, including several text messages sent and received the evening before the robbery.  In one text, Mack told Forrester he had " 'a guy who can move it all once it's trimmed.' "  Forrester said he was " 'grabbing scissors and . . . shit.' "  In another text, Mack promised to " 'start shooting in the air.' "  Forrester responded:  " 'I'm getting the gauge ready' " and " 'and a few other things.' "  At approximately 8:00 a.m. the next morning, Mack made several unanswered calls to Forrester.

The jury convicted Mack of the charges.  In May 2020, the trial court sentenced Mack to six years in prison and ordered him to pay a restitution fine and two assessments.

## DISCUSSION

Mack first contends the robbery conviction must be reversed because the prosecutor failed to timely disclose the data extracted from Mack's cell phone.  We disagree.

One business day before the January 2020 trial, the prosecution disclosed the results of the forensic extraction of data from Mack's cell phone. The extraction was performed in October 2019.  Mack moved to exclude the extracted text messages pursuant to section 1054.7 on the grounds that the disclosure was untimely.  The prosecution acknowledged the information was disclosed "late."  The prosecutor, however, argued the "proper remedy" was not exclusion but a "late discovery instruction," e.g., CALCRIM No. 306.[2]

_____

[2] CALCRIM No. 306 provides:  "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set

5

According to the prosecutor, the late disclosure was due to the software used by the sheriff's department in processing requests for supplemental discovery.

The trial court denied the motion to exclude the evidence. It began by acknowledging "the prosecution is aware of the discovery that is in the hands of their . . . investigating agencies." But the court explained that "[n]othing in the procurement of this evidence made it look like it was untimely. It looked like a clerical error that it wasn't turned over. Nothing I heard makes it look like it was willful or deceptive." Next, the court opined that in lieu of the "less favored" remedy of exclusion, it would "grant the remedy of continuance" or instruct the jury with CALCIRM No. 306. Defense counsel did not request a continuance; instead, counsel urged the court to give CALCRIM No. 306, and the court did so.

"Under section 1054.1, '[t]he prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, *if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies*: . . . All relevant real evidence seized or obtained as a part of the investigation of the offenses charged . . . [and] . . . reports or statements of experts made in conjunction with the case, including the results of . . . scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial.' " (*People v. Little* (1997) 59 Cal.App.4th 426, 429–430.) "[S]ection 1054.1 creates a prosecution duty to inquire and

---

by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the (People/defense) failed to disclose: <describe evidence that was not disclosed> [within the legal time period]. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

6

disclose" the items listed in the statute. (*Little*, at p. 430.) " 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 280; § 1054.7.)

Upon a showing that a discovery violation has occurred, the trial court may "make any order necessary to enforce the provisions of this chapter, including . . . immediate disclosure, . . . delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." (§ 1054.5, subd. (b).) A trial court may prohibit the testimony of a witness pursuant to section 1054.5, subdivision (b) "only if all other sanctions have been exhausted." (§ 1054.5, subd. (c); *People v. Edwards* (1993) 17 Cal.App.4th 1248, 1261 ["[p]reclusion sanctions are drastic and must be used sparingly"], italics omitted.) Exclusion of evidence for a discovery violation "is not an appropriate remedy absent a showing of significant prejudice and willful conduct motivated by a desire to obtain a tactical advantage at trial." (*People v. Jordan* (2003) 108 Cal.App.4th 349, 358.) We "review a trial court's ruling on matters regarding discovery under an abuse of discretion standard." (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

While we do not condone the prosecution's untimely disclosure of the data extracted from Mack's cell phone, we conclude the trial court's choice of discovery sanction was not an abuse of discretion. It was undisputed the prosecutor's failure to timely disclose the evidence was not animated by a desire to gain a tactical advantage at trial. Rather, the timing of the disclosure was the result of software used by the sheriff's department. The court correctly concluded that excluding the evidence was not warranted

7

under the circumstances, and it offered to impose a lesser sanction, i.e., granting a continuance or instructing the jury with CALCRIM No. 306. Mack sought no continuance; nor did he demonstrate in the lower court "that his defense would have been different had he been provided timely discovery of [the] evidence." (*People v. McKinnon* (2011) 52 Cal.4th 610, 668.) Ultimately, the court instructed the jury with CALCRIM No. 306 and permitted defense counsel to urge the jury to "attribute little to no weight" to the evidence in light of the prosecution's failure to timely disclose it. Given the record below, the court's choice of remedy was "more than adequate to remedy the violation of the discovery statute." (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 281.)

Even if the trial court erred by admitting the evidence, any error was harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818. Several witnesses, including Seth's neighbor, described a distinctive car lurking near Seth's property around the time of the robbery. It appeared that Mack — the driver and registered owner of the car — was "looking for somebody." And when questioned by Seth's neighbor, Mack acknowledged he was looking for "two people." Later, Mack's cohort and half brother, Forrester, joined Mack; Forrester's clothing was covered in leaves and briars, and his fingers were coated with marijuana resin. A trove of weapons and ammunition was found in Mack's car — consistent with evidence found at the scene — along with marijuana trimming scissors and garden shears. Nearby, law enforcement officers apprehended the third member of the crew, Sanchez, with a pound of marijuana. Even without the cell phone data, the evidence that Mack aided and abetted the robbery was overwhelming. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054–1056 [sufficient evidence supported conviction premised on aiding and abetting theory of liability].)

Next, Mack argues — and the Attorney General agrees — the sentence must be vacated, and the matter remanded for resentencing in light of ameliorative legislation enacted while this appeal was pending.

At sentencing, the trial court imposed a five-year term on the robbery conviction, count 1, and an additional consecutive one-year term for the arming enhancement. On the conviction for felon in possession of a firearm, count 3, the court imposed and stayed a concurrent two-year sentence. On the conviction for unlawful possession of ammunition, count 4, the court imposed a concurrent two-year sentence.

Section 654 prohibits multiple punishment for any single act or omission. If a single action or course of conduct by a defendant violates multiple laws, "the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, [but] the trial court may impose sentence for only one offense." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.) When Mack was sentenced, trial courts were required to impose sentence under the provision that provided "for the longest potential term of imprisonment" and to stay execution of the other term. (Former § 654, subd. (a).) After Mack's sentencing, the Legislature enacted Assembly Bill No. 518 (2021–2022 Reg. Sess.; Assembly Bill 518). That legislation — which became effective during the pendency of this appeal — gives trial courts discretion "to impose and execute the sentence of *either term*, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379, italics added; § 654, subd. (a).)

The parties agree the matter must be remanded for full resentencing in light of Assembly Bill 518. They are correct. (*People v. Mani, supra,* 74 Cal.App.5th at p. 379.) Under the amended version of section 654 now in

9

effect, the trial court is no longer required to impose sentence on count 1 (the conviction providing the longest potential term of imprisonment) and to stay execution of the sentence on count 3. Instead, the court may punish Mack "under either provision." (*Mani*, at p. 351.)

Because we are remanding for resentencing, we decline Mack's request to apply Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3; Senate Bill 567 [amending section 1170]) and Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5; Assembly Bill 124 [same]) in the first instance. The better approach is to remand to the trial court to decide under the newly amended laws whether Mack is entitled to a reduced sentence. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038–1039.) Because the court will sentence Mack anew, we need not address his contention that the court erred by declining to stay execution of sentence on count 4, nor his claim that the court erred by imposing a restitution fine and two assessments without considering his ability to pay.

## DISPOSITION

The judgment is affirmed. The sentence is vacated, and the matter is remanded for full resentencing consistent with Assembly Bill 518 and other sentencing laws effective January 1, 2022, including Senate Bill 567 and Assembly Bill 124. (See *People v. Flores*, *supra*, 73 Cal.App.5th at p. 1039; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425.) At resentencing, Mack may request a hearing on his ability to pay court-imposed fines, fees, and assessments.

10

_____
Rodríguez, J.

WE CONCUR:


_____
Tucher, P. J.


_____
Fujisaki, J.

A160385

11